UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TCA HEALTH, INC., ) <br> ) <br> *Plaintiff,* ) <br> ) <br> v. ) <br> ) <br> UNITED STATES DEPARTMENT OF ) <br> HEALTH AND HUMAN SERVICES, ) <br> KATHLEEN SEBELIUS, SECRETARY ) <br> OF THE UNITED STATES ) <br> DEPARTMENT OF HEALTH AND ) <br> HUMAN SERVICES , ) <br> ) <br> *Defendants.* ) <br> ) | Civil Case No. |

PLAINTIFF'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

*Introduction*

1.     Plaintiff TCA Health, Inc. ("TCA") is a community health center that receives grant funds under Section 330 of the Public Health Service ("PHS") Act, codified at 42 U.S.C. § 254b.

2.     This case concerns the unlawful undoing of a program enacted by Congress to save federal "grantee" health centers money by providing Federal Tort Claims Act ("FTCA") coverage for the centers' malpractice claims. The Federally Supported Health Centers Assistance Act of 1992, Pub. L. 102-501 (Oct. 24, 1992), amended and reauthorized by The Federally Supported Health Centers Assistance Act of 1995, Pub. L. 104-73 (Dec. 26, 1995) (collectively referred to herein as the "FSHCAA" or the "Act"), codified at 42 U.S.C. § 233(g) *et seq*.

3.     The monetary savings to the program were premised on findings of both the Congress and the Government Accountability Office ("GAO") that the centers' private malpractice insurance costs were not just going through the roof but also were not justified by the health centers' malpractice experience. *See* 138 CONG. REC. S17,862 (daily ed. Oct. 8, 1992) (statement of Sen. Edward Kennedy), 1992 WL 279542 ("However, the health centers have been paying more than $60 million a year for their private sector malpractice premiums, despite the fact that their claims experience has been approximately $5 million annually."); *see also* U.S. Gov't Accounting Office, GAO/HRD-93-150, Federal Medical Malpractice Insurance (Sept. 24, 1993), at 28 ("Relative to the medical malpractice insurance premiums paid, the malpractice claims payments were about 47 percent of what [the actuarial firm engaged by GAO] would have expected…").

4.     The undoing is reflected in what was done to TCA in this case; specifically, actions taken by officials of the Department of Health and Human Services ("HHS" or "the agency") that culminated in the denial of FTCA coverage to TCA, a community "health center" defined in and receiving grant funds under Section 330 of the PHS Act, codified at 42 U.S.C. § 254b, which provides essential health services to thousands of low-income patients who, for the most part, are (as determined by HHS under §§ 254b(a)(1) and (b)(3)) without access to an alternative source of care.

5.     The unlawful agency action at issue has deprived TCA of the FTCA benefit and frustrated the legislative purpose of the FSHCAA by forcing TCA to incur the additional cost of purchasing private malpractice liability insurance out of its current Section 330 grant (with no funding increase) and diminishing, in the process, the services that TCA is able to provide to its patients.

6.     This is not the first time the agency's implementation of the FSHCAA – and, in particular, the manner in which it makes coverage determinations – has been the subject of litigation in the D.C. Circuit. In a case involving a health center in Arizona, a D.C. District Court determined that it had jurisdiction to review the agency's negative coverage determination under the Administrative Procedure Act ("APA"). *El Rio Santa Cruz Neighborhood Health Center, Inc. v. Dep't of Health & Human Servs*., 300 F.Supp.2d 32, 36 (D.D.C. 2004). On the merits, the court held that the denial was arbitrary and capricious because HHS: (a) took an inconsistent position on the same issue by denying FTCA coverage to the plaintiff health center's contract physicians but granting coverage to contract physicians in another similar situation; and (b) failed to examine relevant information that the center had submitted in support of its application for coverage. The Court of Appeals affirmed on the latter of the two grounds. *El Rio Santa Cruz Neighborhood Health Center, Inc. v. Dep't of Health & Human Servs*., 396 F.3d 1265, 1272 (D.C. Cir. 2005).

7.     The D.C. Circuit's determination of its (and the district court's) APA review authority rests on the fact (which HHS admitted, *id*. at 1273) that HHS does not make "coverage determinations for individuals [] in advance but, instead, only after a lawsuit is filed against such individuals and is reported to HHS," despite § 233(g)(1)(E)'s plain mandate that coverage determinations be made within 30 days of an application from a center *and* all such individuals. *Id*. While this case is primarily focused on the adverse determination made on coverage for the health center (which, among a number of other legal defects, violated § 233(g)(1)(E)'s 30-day limit), it is more than simply noteworthy that HHS is still withholding individual coverage decisions until a claim or lawsuit is filed (despite the D.C. Circuit's decision) because it is directly related to the make-whole relief that TCA seeks. TCA seeks declaratory and injunctive

relief to, among other things, set aside the agency's denial of its FTCA coverage and restore that coverage until TCA is afforded an application process that is in accordance with the FSHCAA.

JURISDICTION AND VENUE

8.      This action arises under 42 U.S.C. § 233(g), *et seq*. The Court has federal question jurisdiction (28 U.S.C. § 1331) to review the agency's denial of TCA's deeming application. *See El Rio Santa Cruz*, 396 F.3d at 1275 (challenge to HHS's negative FTCA coverage determination is reviewable under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706); *see also Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967) (recognizing strong presumption in favor of reviewability under APA). TCA has no duty to exhaust administrative remedies within HHS because, as an agency official asserted, no such remedies exist. *See Darby v. Cisneros*, 509 U.S. 137 (1993).

9.      In addition to the authorities stated in the paragraph above, the Court's jurisdiction over this case and the authority to provide the declaratory and injunctive relief requested in this complaint is further supported by 28 U.S.C. §§ 1346(a) and 1361, and the Administrative Procedure Act ("APA"), at 5 U.S.C. §§ 701-706. Venue is proper under 28 U.S.C. §§ 1391(e) and 2201.

THE PARTIES

*Plaintiff*

10.      TCA is an Illinois non-profit, tax-exempt corporation, operating as a primary care clinic that offers comprehensive, high quality health care services to residents of the Altgeld-Murray Homes Public Housing Development and the surrounding areas of Chicago, Illinois. TCA also is a designated "community health center" that is, and at all times relevant to this action was, receiving grant funds under Section 330 of the PHS Act, 42 U.S.C. § 254b.

4

*Defendants*

11.     Defendant HHS has statutory authority over the federal programs on which this complaint is based. The relief sought in this complaint is available from HHS.

12.     Defendant Kathleen Sebelius is the Secretary of HHS. She is sued in her official capacity. The Secretary's authority to delegate the administration of the Section 330 grant program to a unit or division of HHS is limited by 42 U.S.C. § 254b(o), which restricts Secretarial delegation of any or all grant-related responsibilities "[to] the central office of the Health Resources and Services Administration." Within the "central office," the Secretary's authority over such responsibilities has been assigned to the Bureau of Primary Health Care ("BPHC"). The Secretary's authority with respect to the FSHCAA has been delegated to HRSA and then, by HRSA to BPHC.

SECTION 330 COMMUNITY HEALTH CENTER PROGRAM

13.     Section 330 health centers, including TCA, must meet (and TCA does meet) the following legal standards, among others, in order to be a "health center" and receive grant funds under Section 330 of the PHS Act. The center (1) is located in a medically underserved area or serving a medically underserved population (42 U.S.C. § 254b(a)(1)); (2) is community-based – i.e., a majority of its Board of Directors must be patients of the center "who, as a group, represent the individuals being served by the center . . ." (42 U.S.C. § 254b(j)(3)(H)(i)); (3) provides an especially comprehensive range of "primary" and other health services to its patients through a staff of physicians and other health care providers (42 U.S.C. §§ 254b(a)(1)(A) and 254b(j)(3)(A)); (4) provides health care services to Medicaid recipients (42 U.S.C. § 254b(j)(3)(E)); and, (5) serves all residents of its community, regardless of any resident's/patient's ability to pay (42 U.S.C. §§ 254b(a)(1) and 254b(j)(3)(G)(i)).

14.     Health centers uniquely advance the interests of their patients and communities. All centers provide health services to all members of their communities, including those who are poor and not enrolled in any private or government insurance program and therefore cannot pay for services. In addition to their own services, health centers manage care provided to their patients, help them to obtain services the centers do not provide, assist patients in overcoming language barriers, and in getting to and from appointments.

15.     Under Section 330, TCA receives grant funds to carry out the multitude of services Section 330 requires or permits. *See* 42 U.S.C. § 254b(b)(1) and (2). Section 330, its implementing regulations, and other requirements incidental to the grant dictate the manner in which the grantee (a designated "health center" under 42 U.S.C. § 254b(a)(1)) may spend the Section 330 grant money it receives as well as all other revenue it generates as a result of or in connection with the activities, services, and programs the Section 330 grant underwrites. In addition, the terms of Section 330 are such that a grantee health center is legally structured and organized to be such a center. Under separate legislation, Section 330 centers are, among others, authorized to be managed care entities under Medicaid, receive special and larger payments for the services to patients in the Medicaid and Medicare programs, and to purchase prescription drugs at a Federally-imposed discount. The FTCA coverage at issue in this case is one benefit Congress has provided to Section 330 health centers. Thus, health centers, such as TCA, are a creation of federal law, not entities that otherwise would exist and engage in the same or similar activities.

16.     TCA has been a Section 330 grantee continuously since 1991.

17.     In late August 2011, TCA submitted its application responsive to the service area competition for continued Section 330 grant funding. On November 25, 2011, TCA received a Notice of Grant Award ("NGA") for the budget period of December 1, 2011 through November

30, 2012, with a federal award amount of $1,075,881.00. The NGA notes that the project period is for three years.

18.     On March 8, 2012, TCA received another NGA to add certain conditions, including one related to the center's quality improvement/quality assurance ("QI/QA") plan.

19.     On June 29, 2012, BPHC approved of TCA's QI/QA plan, subject to documentation of implementation, due on November 5, 2012.

20.     On December 1, 2012, HRSA issued a NGA to TCA for the budget period of December 1, 2012 through November 30, 2013. The NGA modifies the prior conditions to reflect the agency's approval of the plans submitted by TCA and to request documentation of implementation of those plans. That NGA removed entirely the condition relating to TCA's QI/QA plan, demonstrating HRSA's finding of TCA's compliance with the Section 330 requirement. The continuation of grant funding and the extension of certain deadlines for correcting the issues noted by the grant conditions demonstrate the agency's practice of working with grantees to bring them into compliance.

21.     In addition to the Section 330 health center funding, HRSA awarded TCA a one-time grant award of $1,080,687 in support of primary care medical home activities in September 2011. And on December 14, 2012, about three weeks after the agency denied TCA's deeming application for CY 2013, HRSA awarded TCA $348,000 to fund the purchase of a mobile van to support TCA's mobile student health clinic. The NGA states that it "is issued based on approval of an FY 2013 competitive application submitted in response to HRSA-13-140: School-Based Health Center Capital Program. Additional terms and/or conditions may be applied to this [NGA] if outstanding programmatic compliance issues are identified by HRSA." No additional terms or conditions identified were.

THE FSHCAA

22.     Under the FSHCAA, 42 U.S.C. § 233(g) *et seq.*, Congress sought to solve the problem of rising insurance costs by private malpractice insurance issuers, which (as mentioned earlier) set rates at levels substantially higher than health center malpractice experience (which was far more limited than that of private physicians offering the same services). To avoid the high and unwarranted insurance costs and the resulting diminution in services, the Act placed centers, their staffs, and certain contractors under the protection of the FTCA. The purpose of providing FTCA coverage to eligible Section 330 health centers was and is to significantly reduce, if not eliminate, the need for health centers to use grant funds toward expensive private medical malpractice insurance. H.R. Rep. 102-823(I), at 3 (Aug. 10, 1992), 1992 U.S.C.C.A.N. 2627, 1992 WL 197773. At the time FSHCAA was enacted, it was estimated that 10 percent of the entire annual appropriation for health centers was expended on malpractice insurance coverage, the costs of which had sharply increased in the previous two years. 138 CONG. REC. S17,862 (daily ed. Oct. 8, 1992) (statement of Sen. Edward Kennedy). The financial savings afforded by FTCA coverage would be equivalent to an additional $50 million appropriation, allowing the centers to use funds that would have been spent on malpractice insurance to provide their services to an additional 250,000 medically underserved individuals. *Id.*

23.     The 1992 FSHCAA extended FTCA coverage to Section 330 grantee health centers by authorizing HHS to "deem" health centers and their officers, boards, employees, and contractors to be federal employees of the Public Health Service. Those federal Public Health Service employees were and are covered for medical malpractice under 42 U.S.C. § 233(a)-(f). Subsection (g) and its successors convert the center and those individuals into the same Public Health Service employees covered under earlier provisions of the same section. Sections 233(g)(1)(A) and (D) require an entity seeking to be deemed a Public Health Service employee

8

for purposes of FTCA coverage to submit an application for such coverage in a form and manner prescribed by the Secretary. The statutory requirements for such application are that it contains detailed information and supporting documentation sufficient for HHS to verify that the coverage would apply to all services provided by the particular Section 330 health center to its patients (and in limited circumstances, non-patients), as well as that the center meets the four requirements listed in subsection (h). 42 U.S.C. § 233(g)(1)(D). Section 233(g)(1)(E) further requires the Secretary to make advance FTCA coverage determinations for health centers and individuals within 30 days of receipt of a coverage application. 42 U.S.C. § 233(g)(1)(E). The Act makes an HHS determination in favor of coverage "final and binding" (42 U.S.C. § 233(g)(1)(D)-(F)), but does not do the same with respect to a determination based on the deeming application not to provide coverage. *El Rio Santa Cruz*, 396 F.3d at 1271.

24.     Responsibility for administering the Act has been delegated to a division of HHS' Public Health Service, the Health Resources and Services Administration ("HRSA"), which, in turn, has delegated that authority to BPHC. The delegations to HRSA and then to BPHC, discussed further below, specifically withhold the authority to issue regulations (consistent with 42 U.S.C. § 203). Regulations governing the Act's administration were issued in 42 C.F.R. Part 6. BPHC oversees the Section 330 health center grant program. While it is governed by those regulations in doing so, it has implemented the health center FTCA program largely through issuances known as Policy Information Notices ("PIN") and Program Assistance Letters ("PAL"). *See, e.g.*, PIN 2011-01, *Federal Tort Claims Act (FTCA) Health Center Policy Manual* (Jan. 3, 2011), *available at* http://bphc.hrsa.gov/policiesregulations/policies/pin201101.html (last accessed Jan. 5, 2013) (issued to consolidate previous guidance documents into single primary program resource for FTCA matters).

25.     For the past several years, BPHC has imposed FTCA deeming application requirements and deadlines through PALs. *See* PAL 2010-06, *Calendar Year 2011 Requirements for Federal Tort Claims Act (FTCA) Medical Malpractice Coverage* (May 28, 2010); PAL 2011-05, *Calendar Year 2012 Requirements for Federal Tort Claims Act (FTCA) Medical Malpractice Coverage for Health Centers* (May 18, 2011); and PAL 2012-02, *Calendar Year 2013 Requirements for Federal Tort Claims Act (FTCA) Medical Malpractice Coverage for Health Centers* (January 12, 2012), *available at* http://bphc.hrsa.gov/policiesregulations/policies/pin201101.html (last accessed Jan. 5, 2013). Each new PAL works changes on the "deeming" requirements. Neither these requirements, nor the changes to them, have been promulgated through notice and comment rulemaking, despite their substantive and binding effect on a health center's eligibility for the FTCA benefit.

26.     On August 19, 1994, the agency published a Notice of Proposed Rulemaking ("NPRM") in the Federal Register to implement the 1992 FSHCAA. 59 Fed. Reg. 42790. The proposed rule purported to "set[] forth the information whereby an entity or a person can determine when, and the extent to which, it is likely to be protected under the Act." The NPRM repeats (but does not elaborate on) the statutory requirements for deeming.

27.     On May 8, 1995, the agency published in the Federal Register the Final Rule for the 1992 FSHCAA. 60 Fed. Reg. 22530.

28.     With respect to the "deeming process," the Final Rule provides that "eligible entities will be covered by this part only on and after the effective date of a determination by the Secretary that they meet the requirements of section 224(h) of the [Public Health Service] Act. In making such determination, the Secretary will receive such assurances and conduct such investigations as he or she deems necessary."

29.     While the Final Rule cross-references the criteria or requirements of "section 224(h) of the Act" (i.e., 42 U.S.C. § 233(h)), it (like the NPRM) does not elaborate in any way on those requirements. 42 C.F.R. § 6.5.

30.     The only set of regulations that HHS has issued concerning the health center FTCA program is codified at 42 C.F.R. Part 6. "The Act" to which those regulations refer – and, in particular, the reference to section 224(g) – is to the 1992 statute. *See, e.g.*, 42 C.F.R. §§ 6.1 and 6.2. Neither the 1992 FSHCAA, nor its implementing rule, prescribe a health center application process or impose any timeliness requirement on the Secretary. *See* 42 C.F.R. § 6.1, Pub. L. 102-501.

31.     On September 25, 1995 – prior to the amending Act (*i.e.*, FSHCAA of 1995) – HRSA published a Notice in the Federal Register to list specific situations in which coverage would be provided without requiring the entity to submit an additional application for a particularized determination of FTCA coverage. 60 Fed. Reg. 49417.

32.     In 1995, Congress substantially amended the 1992 FSHCAA. In particular, Congress created a procedure for a health center to file a formal application containing all supporting documentation in advance of any malpractice claims and, to further that purpose, imposed a corresponding obligation on the Secretary to make a coverage determination within 30 days after receipt of an application. *See* Pub. L. 104-73, § 3 (Dec. 26, 1995).

33.     Congress also further explained the statute's purpose:

> To provide health care services, the [health center] grantees (and subcontracting organizations) employ physicians and other health care practitioners either directly or on a contract basis. Purchase of malpractice insurance is one of the most significant expenses for health centers. In 1992, the Committee examined health center expenses for malpractice insurance and found . . . that over $50 million had been spent in Fiscal Year 1989 for malpractice insurance premiums; less than 10 percent of that had been paid out in actual claims payments and related costs.

H.R. Rep. No. 104-398, at 5-6, 104th Cong., 1st Sess. (1995); 1995 U.S.C.C.A.N. 767, 770 (Dec. 12, 1995).

34.     Although Congress obviously believed FTCA coverage would cost less than private insurance, and that the savings would translate into medical care for thousands of additional patients, the legislation explicitly allows health centers either to apply for FTCA coverage or fill their insurance needs by procuring private malpractice insurance with their federal grant funds. 42 U.S.C. § 233(g)(1)(G)(ii). For those centers electing (and receiving) FTCA coverage, sums from the Section 330 PHS Act's annual appropriations are effectively deducted from the centers' grants and used to establish a payment fund for health center-related FTCA claims, although the paragraph describing the establishment of the fund provides that the appropriation of the fund be made separate from appropriations made for purposes of Section 330. 42 U.S.C. § 233(k).

35.     The 1995 legislation also "does not preclude the Secretary from granting an application" and extending FTCA coverage to a health center that re-applies for such coverage after having previously elected to terminate its FTCA coverage. 42 U.S.C. § 233(g)(1)(H).

36.     HHS has never modified or amended its health center FTCA regulations (42 C.F.R. Part 6) since the 1995 amending legislation (*i.e.*, FSHCAA of 1995). In other words, HHS has never issued regulations that clarify or elaborate upon section 224(h)'s eligibility requirements or section 224(g)'s amended deeming application process.

37.     On February 28, 2011, the agency did publish a NPRM, for the purpose of codifying the examples listed in the September 19, 1995 Notice, albeit with a slight modification to one of them. 76 Fed. Reg. 10825. The NPRM did not address or elaborate on health center eligibility requirements or the deeming application process. *Id.* The comment period for the NPRM expired April 28, 2011. To date, no Final Rule has been published.

TCA'S HISTORY OF FTCA COVERAGE

38.     TCA had opted for and maintained FTCA coverage continuously since 1996, until BPHC denied its application for CY 2013 coverage on November 19, 2012. The main events leading up to that denial are as follows:

39.     In anticipation of receiving coverage for calendar year ("CY") 2013, TCA submitted its application for re-deeming on April 5, 2012. More than six months later, on November 19, 2012, HHS – acting through the BPHC division of HRSA – denied TCA's application, effectively terminating its FTCA coverage as of January 1, 2013. The decision letter (referred to as a Notice of Deeming Action) says that the agency's negative coverage determination is "final and binding" and precludes TCA from re-applying for FTCA coverage before January 1, 2013.

40.     On July 15, 2011, TCA submitted a timely deeming application for FTCA coverage in CY 2012. Additional documents were attached to TCA's application on November 9-10, 2011. BPHC did not approve that application until December 16, 2011.

41.     On January 23-25, 2012, HRSA conducted an Operational Assessment site visit at TCA for which TCA's HRSA project officer, Brenda Wise, was present. HRSA conducts Operational Assessment site visits of Section 330 grantees to assess compliance with key program requirements and identify areas for performance and operational improvement. TCA's Operational Assessment included a review of its approved CY 2012 FTCA re-deeming application and supporting documents.

42.     On April 2, 2012, TCA received a preliminary copy of the Operational Assessment site visit report from its project officer. The report was issued just 3 days prior to the April 5, 2012 deadline for health center deeming applications for CY 2013. The report recommended that an onsite review be conducted prior to FTCA deeming of TCA. The

recommendation was purportedly premised on a finding that TCA's FTCA deeming application for CY 2012 coverage (which BPHC had literally just approved, on December 16, 2011, four weeks prior to the site visit) "contained inconsistent responses to application questions." No additional explanation of the finding or recommendation was provided in the report.

43.     On April 5, 2012, using the agency's electronic system (electronic handbook or "EHB"), TCA submitted its FTCA deeming application for CY 2013. In addition to some documentation required for CY 2012, the application for CY 2013 coverage included documentation not previously required by BPHC and revised versions of certain policies and procedures.

44.     On or about August 22, 2012, about four and half months after TCA had submitted its CY 2013 application, it received a letter from HRSA regarding its FTCA deeming application for CY 2013. That letter stated, in part, that "the deeming application submitted and other material considered lead us to conclude that there is a need to confirm" information related to credentialing and privileging, quality improvement and assurance, risk management systems, and professional liability history. The letter further requested that TCA respond in detail to each of the identified concerns and provide the requested documentation by September 24, 2012. Attached to the letter was a "Detailed Notice Form" that specifically identified the agency's concerns in a bulleted list, but did not include references or citations to any published statutory or regulatory requirement for FTCA coverage.

45.     On September 12-14, 2012, the agency conducted a FTCA site visit.

46.     On September 24, 2012, TCA responded to each of the concerns expressed in the August 22, 2012 letter and provided all of the requested documentation. The documentation included revisions to address reviewer comments raised in the Operational Assessment site visit

conducted in January and the FTCA site visit conducted just ten days before TCA submitted its

response.

47.     On November 19, 2012, TCA received an electronic notification that HRSA had

completed its review of TCA's FTCA application. Attached to the email was the Notice of

Deeming Action for Calendar Year 2013. Aside from template language summarizing the

statutory authority (section 224(h) of the PHS Act) for deeming health centers, the Notice of

Deeming Action stated the following as the rationale for its negative coverage decision:

> We regret to inform you that HRSA is unable to make the requisite
> determination required by Section 224(h)(1) at this time. In
> particular, we are unable to determine that the center has
> implemented appropriate quality assurance/quality improvement
> (QA/QI) policies and procedures, including professional liability
> claims review, risk management and credentialing and privileging
> systems related thereto. Therefore, deemed status for TCA Health
> Inc. has been disapproved. This decision is not subject to
> administrative appeal, but you may re-apply for FTCA coverage on
> or after January 1, 2013, during periods when the EHB system is
> open to accept applications.

48.     The Notice of Deeming Action makes no mention whatsoever of the relevant

documents or information that TCA submitted in support of its application, including the highly

pertinent and favorable fact that TCA has been continuously deemed since at least 1996 and has

not had a single malpractice claim against the center or one its providers in the past six

consecutive years.

49.     On Tuesday, November 20, 2012, TCA's HRSA project officer, Ms. Wise,

forwarded to TCA's Chief Executive Officer, Veronica Clarke, email notification that "[f]inal

FTCA deeming determinations have been released and your health center has been

disapproved.?While [*sic*] the determination is final [*sic*] and binding, I am available for a

conference meeting if you would like to discuss the determination and next steps." The following

week, on November 27, 2012, Ms. Clarke, along with TCA's local counsel, William Miceli,

participated in a conference call with the individuals from HRSA to discuss HRSA's determination to terminate TCA's deemed status and associated FTCA malpractice liability insurance coverage. During that call, counsel for TCA requested an extension of TCA's deeming period to afford TCA an opportunity to resolve the BPHC's concerns with respect to TCA's application and operations. Counsel was then advised by an agency official that he was unwelcome on the call and counsel disconnected from the call, leaving TCA without the legal representation of its choosing, while government counsel remained on the call.

50.    On December 13, 2012, counsel for TCA contacted Tonya Bowers, BPHC's Deputy Associate Administrator, and again requested the extension of TCA's current "deemed" status (and associated FTCA coverage) beyond December 31, 2012 to resolve BPHC's concerns. BPHC (through Ms. Bowers) denied TCA's extension request (to avoid a gap in FTCA coverage) without explanation.

51.    On December 27, 2012, TCA counsel notified the agency of all associated costs with respect to the center procuring private malpractice insurance for 2013 in the hopes that the actual numbers associated with the cost of private insurance (including "tail" coverage) would cause BPHC to reconsider its decision. Counsel explained that not only do these costs create a substantial negative financial impact for TCA, it also represents an unnecessary use of resources that could otherwise be devoted to the provision of patient care. In light of these negative consequences, counsel asked BPHC to reconsider its position and extend TCA's current deemed status. HRSA notified counsel the following day (*via* email) that it would not change its position. In doing so, BPHC summarized the chronology of events leading to its adverse Notice of Deeming Action. But once again the agency failed to articulate a rational basis for its denial and refused to grant TCA's extension request.

## THE AGENCY'S DENIAL IS UNLAWFUL

52.    The agency's denial of TCA's deeming application is arbitrary, capricious, and contrary to law, in violation of the Administrative Procedure Act ("APA"), for the reasons stated below.

## DEFEDANTS DENIED TCA'S DEEMING APPLICATION
## BASED ON UNLAWFUL RULES

53.    The agency's decision to deny TCA's deeming application is arbitrary and contrary to law because it rests on (what we label here as) *de facto* regulations (regulations with the force and effect of a "rule" as defined in 5 U.S.C. § 551(4)) that were issued without (a) authority or (b) notice and comment rulemaking. 5 U.S.C. § 553(b)(3).

54.    To begin with, neither the HRSA nor BPHC is authorized to issue *regulations* concerning the health center FTCA program. The authority to do so is reserved exclusively to the Secretary of HHS. Unlike much of the Secretary's authority under the PHS Act, the authority to issue regulations is non-delegable. 42 U.S.C. § 203. On information and belief, the delegations of authority to HRSA and BPHC, in conformity with § 203, explicitly exclude such authority. As such, the substantive and binding rules concerning the health center FTCA program that were the basis of the final determination not to deem TCA as FTCA covered for CY 2013 are unlawful and *ultra vires*. The unlawful requirements were issued through what HRSA and BPHC refer to as PINs and PALs, which are not mere guidelines but purport to have the force of law.

55.    There can be no question that beyond the statutory requirements specified in subsection (h) and the Act's implementing regulations, the agency has imposed a number of additional substantive and binding requirements – through *de facto* regulations in the form of such PINS and PALS – on health centers seeking the benefit and protection of FTCA coverage. The problem, as previously noted, is that those additional requirements (even if authorized) were not

promulgated through notice and comment rulemaking, as required by 5 U.S.C. § 553(b). *State of Alaska v. Dept. of Transportation*, 868 F.2d 441, 445 (D.C. Cir. 1989) ("substantive" or "legislative" rules are subject to the APA, which requires notice-and-comment procedures) (citing 5 U.S.C. § 553(b)).

56.     Substantive rules are those which effect a change in existing law or policy, or impose additional substantive requirements. Moreover, such a rule or "agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383-84 (D.C. Cir. 2002) (internal citation omitted) ("It is enough for the agency's statement to 'purport to bind' those subject to it, that is, to be cast in 'mandatory language' so 'the affected private parties are reasonably led to believe that failure to conform will bring adverse consequences.'" (internal quotation marks omitted); *see also Chamber of Commerce of U.S. v. U.S. Dept. of Labor*, 174 F.3d 206, 212–13 (D.C. Cir. 1999).

57.     Here, PAL 2012-02, *2013 Requirements for Federal Tort Claims Act (FTCA) Medical Malpractice Coverage for Health Centers*, *supra*, specifically refers to "New Application Changes" and sets forth requirements on health centers that are both different from past requirements and beyond those specified in subsection (h). 42 U.S.C. § 233(h). Using classic mandatory language – *i.e.*, "must" – Section VIII of PAL 2012-02 sets forth criteria for a health center grantee to be deemed a PHS employee for FTCA purposes. In particular, Section VIII (at 6) provides that a grantee's FTCA application "must contain," among other things, a "Quality Improvement/Quality Assurance (QI/QA) Plan, with clear documentation that the Board reviewed and approved the plan within 3 years of the date of submission to HRSA." Other items *required* by PAL 2012-02 for FTCA coverage include "Minutes for the last six QI/QA committee meetings that clearly document QI/QA activities[,]" "Minutes for the last six Board meetings, to the extent that

these reflect Board approval of QI/QA activities[,]" and policies for referral and hospitalization tracking. *See* PAL 2012-02, *Calendar Year 2013 Requirements for Federal Tort Claims Act (FTCA) Medical Malpractice Coverage for Health Centers* (January 12, 2012), *available at* http://bphc.hrsa.gov/policiesregulations/policies/pin201101.html (last accessed Jan. 5, 2013).

58.     Section VIII of PAL 2012-02 incorporates the very sort of substantive and binding criteria that constitute legislative rules and require notice-and-comment rulemaking. *State of Alaska*, 868 F.2d at 445. These self-described requirements are not merely "interpretative" of statutory language directing the Secretary to determine that a health center has implemented appropriate policies and procedures. *Natural Res. Def. Council v. EPA*, 643 F.3d 311, 321 (D.C. Cir. 2011) (holding guidance provision entitling alternatives to EPA standard is legislative, rather than interpretive, because "nothing in statute, prior regulations or case law" provided for such a measure).

59.     While the FSHCAA (at 42 U.S.C. § 233(g)) does require a health center to implement "appropriate policies and procedures to reduce the risk of malpractice and the risk of lawsuits," it does not specify what constitutes "appropriate" policies and procedures. Given that lack of specificity, it is in every way (legal and practical) appropriate for the agency to interpret the statute through regulations and to limit informal issuances, to, at most, clarifications or non-binding guidance. The purpose of the APA would be frustrated if an agency with such a broad statutory command (*e.g.*, to ensure implementation of "appropriate policies and procedures") could avoid notice-and-comment rulemaking simply by promulgating a comparably broad regulation (or no regulation), and then invoke its power to interpret that statute and regulation through issuances such as PINs and PALs that bind grantees to a strict and extensive set of obligations and eligibility criteria. *Boose v. Tri–County Metro. Transp. Dist.*, 587 F.3d 997, 1005 (9th Cir. 2009) ("We will not, under the guise of deference, engage in an end-run around notice-and-comment rulemaking.").

The same can be said for 42 U.S.C. § 203, under which Congress restricts regulatory issuance authority under the PHS Act to the Secretary. If subordinates are permitted to issue and impose *de facto* regulations, the statutory restriction is nullified.

60.     The congressional intent for a straightforward and efficient process – for all eligible entities and individuals – is expressed clearly in the legislative history. H.R. Rep. No. 104-398, 1995 U.S.C.C.A.N. 767-768, 770 (1995 amendments to FSHCAA designed "to improve the efficiency of the operation of the program" and increase health center participation in FTCA program), and evidenced by the fact that Congress expects "free clinics," with limited resources, to meet the same requirements as health center applicants.

61.     The fact that BPHC has created and applied *de facto* regulations on health centers (without notice and comment rulemaking) is confirmed by its disparate treatment of health centers and "free clinics." That is, BPHC imposes, though PALs, a different and more burdensome set of requirements on health centers than it imposes on "free clinics," despite the fact that the statutory requirements are *exactly the same for each type of entity*. 42 U.S.C. §§ 233(g), (h), and (o). To obtain FTCA coverage for any of its volunteer health care practitioners, a "free clinic" must submit an application that satisfies the *exact same* subsection (h) requirements that a Section 330 health center must satisfy. 42 U.S.C. § 233(o)(2)(5)(c)(i) ("free clinic submits to the Secretary an application meeting the requirements of subsection (g)(1)(D)," which incorporates subsection (h)'s requirements). Another indication that the requirements are the same is the fact that the Secretary must adhere to the same 30-day limit to make a coverage determination for both types of entities. 42 U.S.C. § 233(g)(1)(E) (30-day limit applies to "an application under subparagraph [(g)(1)](D)" by anyone).

62.     BPHC imposes different requirements on health centers and "free clinics" through the PALs that govern deeming applications for each type of entity. *Compare* PAL 2012-02, *supra*,

with PAL 2012-04, *Calendar Year 2013 Federal Tort Claims Act (FTCA) Deeming Application for Free Clinics* (June 19, 2012), *available at* http://bphc.hrsa.gov/policiesregulations/policies/pal201204.html (last accessed Jan. 5, 2013).

63.     It is clear that the health center specific requirements are in addition to, and not merely expressions of, the statutory requirements because otherwise BPHC would, and would be obligated to, apply them equally to both types of entities. And, more to the point, it is arbitrary and capricious for the agency to have created a different and more burdensome set of rules or application requirements (*i.e.*, PAL 2012-02), as between two types of applicants, where the governing statute makes clear that the requirements – that apply to both types of applicants – *are the same*.

64.     The inconsistency is especially egregious given that the agency's previously published position that its regulations on FSHCAA do *not* address "risk management and Quality Assurance" functions because "they are not addressed in the statute [*i.e.*, the FSHCAA] being implemented." 60 Fed. Reg. 22530 (May 8, 1995). Those functions are governed by Section 330 requirements. *Id.*; *see also* 42 C.F.R. § 51c.303(c) ("[a] community health center" must "[h]ave an ongoing quality assurance program . . ."). HRSA found that TCA's quality improvement and quality assurance plan satisfied the Section 330 requirements when it removed the grant condition related to those activities from the December 1, 2012 NGA. That TCA could have a QA/QI plan sufficient for Section 330 purposes but somehow be denied FTCA coverage because of its QA/QI plan is a (unexplained, arbitrary, and capricious) mystery, especially considering that it is the Section 330 requirements that control. 60 Fed. Reg. 22530; 42 C.F.R. § 51c.303(c).

65.     The existence of the Section 330 health center regulatory requirements concerning risk management and quality assurance functions, 42 C.F.R. § 51c.303(c), coupled with the agency's statement that its FSHCAA regulations do not address those functions because they are

"governed by [Section 330 grant] requirements," confirms that BPHC's quality assurance and risk management requirements are necessarily *de facto* regulations.

## THE AGENCY VIOLATED THE MANDATORY 30-DAY LIMIT ON MAKING COVERAGE DETERMINATIONS

66.     The agency violated the FSHCAA's clear and unequivocal command to make a FTCA coverage determination "within 30 days" of receipt of a deeming application. 42 U.S.C. § 233(g)(1)(E). The agency received TCA's application on April 5, 2012, but failed to make its determination until more than six months later, on November 19, 2012. As a result, the agency deprived TCA of the due process contemplated by the Act and frustrated its purpose by forcing TCA to use its health center funds to procure private malpractice insurance for CY 2013.

67.     To facilitate and increase health center participation in the FTCA program, the FSHCAA establishes a straightforward set of requirements and application process. First, the Act defines a Public Health Service employee eligible for FTCA coverage to include a Section 330 health center (such as TCA) and "any officer, governing board member, or employee," and certain contracted providers of such an entity. 42 U.S.C. § 233(g).

68.     Second, a health center must submit an "application" to the agency, in "such form and such manner as the Secretary shall prescribe," that contains "detailed information, along with supporting documentation, to verify" that: (a) coverage would apply to all services provided by the entity to its patients and, in limited circumstances, non-patients; and (b) "the entity, and the officer, governing board member, employee, or contractor of the entity, as the case may be, meets the requirements" of subsection (h).

69.     The requirements of subsection (h) are as follows:

[T]he entity –
(1) has implemented appropriate policies and procedures to reduce the risk of malpractice and the risk of lawsuits arising out of any health or health-related functions performed by the entity;

(2) has reviewed and verified the professional credentials, references, claims history, fitness, professional review organization findings, and license status of its physicians and other licensed or certified health care practitioners, and, where necessary, has obtained the permission from these individuals to gain access to this information;

(3) has no history of claims having been filed against the United States as a result of the application of this section to the entity or its officers, employees, or contractors as provided for under this section or, if such a history exists, has fully cooperated with the Attorney General in defending against any such claims and either has taken, or will take, any necessary corrective steps to assure against such claims in the future; and

(4) will fully cooperate with the Attorney General in providing information relating to an estimate described under subsection (k) of this section.

42 U.S.C. § 233(h).

70.     Third, the Secretary "shall make a determination of whether an entity or an officer, governing board member, employee, or contractor of the entity is deemed to be an employee of the Public Health Service for purposes of this section *within 30 days after the receipt of an application*…" 42 U.S.C. § 233(g)(1)(E) (emphasis added). A determination in *favor* of coverage "shall apply for the period specified by the Secretary," 42 U.S.C. § 233(g)(1)(E), and such a determination is "final and binding" upon the federal government and other parties to any civil action or proceeding. *Id*. at § 233(g)(1)(D)-(F).

71.     The 30-day limit on coverage determinations and other "procedural modifications" were enacted as part of the 1995 amendments to FSHCAA "to improve the efficiency of the operation of the program" and increase health center participation in the FTCA

program. H.R. Rep. No. 104-398, at 5 (December 12, 1995), 1995 U.S.C.C.A.N. 767-768, 770

("[t]he Committee expects that the enactment of this legislation extending the program,

clarifying coverage, and improving procedures, along with continued efforts by the Department

to implement the legislation, will lead many more health centers to drop their private malpractice

coverage and participate fully in the program"). By requiring the Secretary to make prompt and

advance coverage determinations, the 30-day limit ensures that an applicant and its doctors, etc.,

while awaiting the Secretary's determination, are not pressured so as to force the applicant to

purchase private malpractice liability insurance (precisely the outcome the Act sought to

eliminate) simply as a precaution against a potential negative determination. The FSHCAA also

contemplates that, in the event of a (timely) negative coverage determination, the applicant

would have a reasonable opportunity to pursue one or more of the following options: seek

reconsideration of the Secretary's decision; submit a new application (one that addresses the

Secretary's stated basis for the prior denial); challenge the Secretary's decision under the APA;

or, take steps to procure private malpractice insurance. *El Rio Santa Cruz*, 396 F.3d at 1272

(recognizing statute's "final and binding" clause does not apply to a negative coverage

determination and such a decision is subject to challenge under the APA).

　　　72.　　In PAL 2012-02, the section entitled Initial FTCA Applications provides that,

"[w]ithin 30 days after a complete initial FTCA application has been received by HRSA, HRSA

will notify through EHB the contact person(s) identified by the health center of a final

determination." PAL 2012-02, § VI, at 5. In contrast, however, the section on renewal

applications makes no reference to the 30-day limit. *Id*. at § VII. It is not clear whether the

distinction is deliberate and signals the agency's view that the 30-day limit applies only to new,

and not renewal, applications. Such a distinction would be contrary to the plain language of the

FSHCAA, which applies the 30-day limit to "an application under subparagraph (D)" by *any* eligible entity or individual.

73.     By failing to act on TCA's application within the prescribed 30-days, in violation of the FSHCAA's unequivocal 30-day limit, the agency deprived TCA of the due process contemplated by the Act and frustrated its purpose by forcing TCA to procure private malpractice liability insurance for CY 2013. Had the agency complied with the 30-day rule (and acted consistent with its stated policies, discussed in greater detail *infra*), TCA would have had ample opportunity to resolve any concerns with respect to its application and FTCA coverage for CY 2013.

## THE AGENCY FAILED TO EXAMINE ISSUES AND EVIDENCE PRESENTED BY TCA

74.     The agency completely failed to examine the information that TCA submitted in support of its CY 2013 deeming application (by attempting to satisfy the *de facto* regulations).

75.     Notwithstanding TCA's contention here that the criteria used to deny deeming are unlawful, there is no dispute that TCA submitted, and the agency had before it, a considerable amount of information in support of the center's CY 2013 deeming application.

76.     First, the center's April 5, 2012 application contains narrative answers to the specific application questions, as well as several documents uploaded in support of the answers. Those documents include TCA's patient tracking policy and an addendum to the patient tracking policy, the finalized Quality Improvement Plan that would be approved at the April 24, 2012 board meeting, meeting minutes of the board from February and March 2012 showing discussion of the QI plan, meeting minutes from the QI committees of the staff and the governing board, a spreadsheet of TCA licensed and certified staff for credentialing purposes, and a copy of the credentialing policy.

77. Second, TCA submitted a substantial amount of information and documents to address and resolve each of the concerns the agency expressed (in its August 22, 2012 letter) with respect to its application. In response to those concerns, TCA submitted additional narrative responses and documentation on September 24, 2012. For example, in response to the agency reviewer's concern that the "[t]racking policy…does not address a more immediate response for follow-up which may pose increased risk for adverse patient outcome," TCA responded that it "created a new and separate Laboratory Results Policy which addresses a more immediate response for all follow-up in a proactive attempt to decrease and avoid risk." TCA then attached the new policy to its response, with corrections highlighted in red. That policy calls for immediate direct verbal communication to patients with critical results.

78. The evidence before the agency at the time it made its determination shows that TCA responded to and satisfied each and every concern expressed by the agency. It also showed that TCA is committed to taking all necessary actions to be deemed for CY 2013. But none of the information or evidence that TCA submitted in support of its application or in response to the agency's concerns is confronted or examined in the denial notice. There is only the vague statement that the agency is "unable to determine that the center has implemented appropriate quality assurance/quality improvement (QA/QI) policies and procedures, including professional liability claims review, risk management and credentialing and privileging systems related thereto." As discussed above, quality assurance/quality improvement is Section 330 (not a FTCA) requirement, which the agency had already concluded that TCA satisfied.

79. On its face, the Notice of Deeming Action makes no effort to examine the facts, much less a connection between the never-found facts and the choice made. The arbitrariness of the agency's action is particularly apparent in this case because the agency did not explain why it was "unable to determine" that TCA met the requirements for deeming, despite TCA's considerable

submissions and what by all accounts should be the two facts most relevant to its deeming of TCA: (1) the agency had just approved TCA's Section 330 grant for a three year project; and (2) TCA has been continuously deemed since as early as 1996, and has not had a single malpractice claim, much less a lawsuit, in the past 6 consecutive years.

80.     The agency produced a FTCA site visit report but it was not provided to TCA until December 3, 2012, after it had already received the denial notice. Whether the agency had a copy of the FTCA site visit report (which postdates the denial notice) and relied on that report (or parts thereof) in making its determination is unknown to TCA at this time.

81.     It would have been one thing if the center had *not submitted* any information in support of its application, then perhaps a decision indicating that the agency was "unable" to make the requisite determination (because of the absence of information or evidence) would make sense. But where, as here, the center submitted a substantial amount of information to demonstrate that it had "implemented appropriate quality assurance/quality improvement (QA/QI) policies and procedures, including professional liability claims review, risk management and credentialing and privileging systems related thereto," to make a proper decision, the agency had to examine that information and explain how or why that information failed to satisfy the particular requirements.

82.     While discussed in more detail below, it bears mention that, if the agency had acted consistent with its custom and practice, not to mention the intent of the FSHCAA, it would have worked with TCA to resolve its concerns with TCA's submission to avoid a gap in FTCA coverage.

## THE AGENCY FAILED TO ARTICULATE A
## RATIONAL BASIS FOR ITS DENIAL

83.     As just mentioned, not only does the agency decision fail to confront the evidence before it, but its decision fails to articulate any rationale for its decision at all. The agency's

complete failure to provide a reasoned basis for its decision, including but not limited to its failure to confront the evidence before it, is yet another violation of a cornerstone principle of administrative law, and on its own necessitates a decision that the agency action be set aside.

84.     The agency is required, at a minimum, to "examine the relevant data and articulate a satisfactory explanation" that reflects a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs.,* 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)) (internal quotation marks omitted). *See also Tourus Records, Inc.*, 259 F.3d at 736. In other words, "not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Fox v. Clinton*, 684 F.3d 67, 74-75 (D.C. Cir. 2012) (quoting *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006)) (internal citations omitted). Ultimately, "an agency action must be the product of reasoned decisionmaking." *Id.* (citing *Coburn v. McHugh*, 679 F.3d 924 (D.C. Cir. 2012)).

85.     Here, the agency's failure to confront the evidence before it results in an absence of any facts found by the agency. Without facts found, there is no possible way for the agency to establish a "rational connection between the facts found and the choice made." After submitting its response to the agency's August 22, 2012 letter (on September 24, 2012), TCA heard nothing until six weeks later, when it received the denial. The November 19, 2012 denial letter provides only that:

> HRSA is unable to make the requisite determination required by Section 224(h)(1) at this time. In particular, we are unable to determine that the center has implemented appropriate quality assurance/quality improvement (QA/QI) policies and procedures, including professional liability claims review, risk management and credentialing and privileging systems related thereto. Therefore, deemed status for TCA Health Inc. has been disapproved.

86.     Subsequent communications with the agency in TCA's attempt to reach a resolution without litigation failed to provide an adequate explanation for the agency's decision, its refusal to extend the center's deemed status, or its departure from custom and practice (discussed in greater detail below). In a December 28, 2012 email to TCA's counsel, Dr. Seiji Hayashi writes only that "HRSA reviewed all information submitted by the deadline, as well as site visit information. It was determined that TCA was out of compliance and had not successfully demonstrated compliance." The email also makes it clear that the agency's decision was premised on the *de facto* regulations (PINs and PALs previously discussed). The statutory reference in the email is to the general authority; it is the PINs and PALs that provide the specifics.

> The legal authority supporting BPHC's decision to disapprove TCA's application for deeming has been stated in our previous communications with TCA but can generally be found in the Public Health Service Act at 42 U.S.C. § 233(g)(1)(D) and 42 U.S.C. § 233(h) and in the policy issuances available on HRSA's website at http://bphc.hrsa.gov/policiesregulations/policies/index.html. As we have explained, TCA may reapply for deemed PHS employment on or after January 1, 2013. We encourage TCA to continue its work to correct the noted compliance issues and thereby strengthen any potential future deeming applications.

87.     Like previous communications from the agency, that email provides no explanation of the agency's decision to deny TCA's application for deeming. The (general) statutory authority cited in Dr. Hayashi's email requires only that an applicant "has implemented appropriate policies and procedures to reduce the risk of malpractice and the risk of lawsuits arising out of any health or health-related functions performed by the entity," 42 U.S.C. § 233(h)(1). That TCA has in fact met that general standard is supported by the fact that TCA has not had a single malpractice lawsuit in the past 6 consecutive years.

88.     In summary, the agency's denial notice and its later communications with TCA are devoid of any connection, rational or otherwise, between TCA's application and

supplemental documentation and the agency's denial of that application. Such conclusory – not to mention, after the fact – statements are no substitute for reasoned decisionmaking. *See Fox v. Clinton*, 684 F.3d at 78 (giving no deference to agency letter that "offered little more than uncited, conclusory assertions of law"). The point for this case, however, is that even the agency's post hoc "explanations" lack facts and rationale. The same point is relevant to the relief TCA here seeks. Unless the *de facto* regulations are set aside, TCA in submitting a new deeming application is essentially "flying blind" on what it must add to or subtract from its previous one to secure a positive decision.

### THE AGENCY'S REAPPLICATION BAR IS CONTRARY TO THE FSHCAA AND AN INEXPLICABLE DEPARTURE FROM LONGSTANDING POLICIES AND PRACTICES

89.     The agency added insult to injury (its deeming application denial) by barring TCA from reapplying for FTCA coverage until on or after January 1, 2013. As it sole rationale for doing so, the agency asserted that a denial of FTCA coverage is "final and binding" as a matter of law. That is not in and of itself a reason for the bar. Even if it were, it is unsustainable for at least two good reasons.

90.     First, a reapplication bar it is unsupported by any reasonable interpretation of the FSHCAA (or its implementing regulation) and contrary to its purpose. By its own terms, subsection (g)(1)(F)'s "final and binding" clause applies only to *affirmative* (not negative) FTCA coverage determinations. *El Rio Santa Cruz*, 396 F.3d at 1271 ("plain text of the FSHCAA speaks only to the final and binding nature of the Secretary's affirmative coverage determinations, and not to negative coverage determinations"). While a negative determination is final for purposes of APA review, nothing in the Act precludes the Secretary from reconsidering an initial negative determination or entertaining a center's *re*application *at any point in time*.

Indeed, within subsection (g) itself, Congress expressly rejects the notion that a center may be barred from reapplying for FTCA coverage where a center reapplies after having voluntarily terminated its FTCA coverage. 42 U.S.C. § 233(g)(1)(H). In other words, even where a health center elects to terminate its FTCA coverage, and the termination has become legally effective, it may change its mind – for whatever reason and at any time – and reapply for FTCA coverage. 42 U.S.C. § 233(g)(1)(H). The statute makes clear that a health center's "election" to terminate FTCA coverage "does not preclude the Secretary from approving the application" of that center "and thereby restoring" its FTCA coverage. *Id*. at § 233(g)(1)(H)(iv).

91.    Moreover, a bar on health center reapplications that precludes the centers' participation in the FTCA program for any length of time, squarely undermines the express purpose of the Act, and makes as much sense as cutting off one's nose to spite the face. The FSHCAA is expressly designed to encourage, facilitate, and maximize health center participation in the FTCA program in order to "eliminate the expense borne by federally funded health centers for medical malpractice insurance" and enable centers "to funnel more federal dollars [*i.e.*, the savings] into patient care." *Cruz v. United States*, 70 F.Supp.2d 1290, 1292 (S.D. Fla. 1998) (citing H.R. Rep. No. 104-398 (1995)); *see also* H.R. Rep. No. 102-823(II), at 6 (1992) (extending FTCA coverage to federally funded health centers to allow them to "redirect funds now spent on malpractice insurance premiums toward improving or expanding their services to their target populations").

92.    By unlawfully precluding TCA's reapplication for FTCA coverage until CY 2013, the agency has forced a gap in the center's FTCA coverage that the center had no choice but to fill with overpriced private insurance out of Section 330 grant funds – the very cost that the Act sought to eliminate. The cost to the center (and the federal government) of private malpractice insurance, for one day of coverage, is about $160,000. That amount includes the

minimum earned insurance premium (which is 25 percent of the annual premium or $34,000) and the tail insurance for the corresponding first quarter of the year (which is $126,000 and would cover later claims made for acts or omissions within that quarter). The total annual premium plus tail coverage is nearly $650,000. Had the agency complied with the unambiguous language of the statute, and worked with the center to address the agency's concerns (consistent with the agency's custom and practice), the cost of private insurance would have been easily avoided.

93.    Second, the agency's novel interpretation of FSHCAA as imposing a reapplication bar constitutes a departure from, if not a reversal of, the agency's longstanding views as to the meaning of the Act and its implementation. For example, the agency's FTCA "Policy Manual" describes the objective of the Act as follows:

> The intent of the Health Center FTCA Medical Malpractice Program is to increase the availability of funds to health centers to provide primary health care services. By reducing or eliminating health centers' malpractice insurance premiums, more health center dollars are available for:
> • Increasing the number of patients served;
> • Increasing enabling services like case management and health education;
> • Reducing financial, geographic, and cultural/linguistic barriers to care; and
> • Implementing and expanding programs such as quality improvement/assurance and risk management and other appropriate section 330–funded activities.

PIN 2011-01, *supra*, at 4.

94.    Since as early as 1995, the agency has stressed the cost-saving benefit of allowing health centers to obtain FTCA coverage "*at the earliest possible date.*" Department of Health and Human Services, Federally Supported Health Centers Assistance Act of 1992, 60 Fed. Reg. 22530, 22531 (May 8, 1995), 1195 WL 261773 (emphasis added) (health center FTCA regulations implement FSHCAA of 1992). The regulations have not been amended since the

enactment of FSHCAA of 1995. In particular, when the agency amended its health center FTCA regulations – to specify examples of FTCA coverage for services to those who are *not* patients of the center – it stated in pertinent part:

> It is cost effective to permit health centers to take advantage of the statutory liability protection that is clarified by these regulations at the earliest possible date. Until these regulations are effective, health centers will continue to pay private insurance premiums for liability protection that is provided for under the FTCA.

*Id*.

95.     A reapplication bar or period of exclusion, by its very nature, prevents a health center applicant or re-applicant from "tak[ing] advantage of the statutory liability protection" and participating fully in the program "at the earliest possible date." *Id*.; *see also* H.R. Rep. 104-398, at 6 (1995) ("The Committee expects that the enactment of this legislation extending the program, clarifying coverage, and improving procedures, along with continued efforts by the Department to implement the legislation, will lead many more health centers to drop their private malpractice coverage and participate fully in the program").

96.     To implement the FSHCAA, and maximize the savings it is designed to achieve, the agency has long followed a custom and practice of working with health centers to secure and maintain FTCA coverage. That custom and practice is expressed in PAL 2012-02:

> Consistent with applicable law and HRSA's programmatic oversight and monitoring responsibilities, entities seeking deemed federal employee status are assessed for their implementation of FTCA program requirements and, whenever possible, are provided an opportunity to remedy areas of non-compliance…
>
> It is HRSA's goal to support all health centers in successfully demonstrating compliance with and implementation of these requirements.

PAL 2012-02, § 2 (emphasis added).

97.     It is impossible to reconcile the agency's longstanding custom and practice of working with centers "whenever possible" to "remedy areas of non-compliance" with the agency's reapplication bar and refusal to extend TCA's deemed status, despite its different treatment of centers in similar circumstances (discussed below).

98.     There is no question that TCA was harmed by the untimely denial and reapplication bar because they precluded the agency from: (a) following its longstanding custom and practice of working with centers to secure and maintain FTCA coverage; (b) entertaining a request for reconsideration; (c) entertaining a reapplication for FTCA coverage; or (d) extending TCA's deemed status to address and correct any actual or perceived deficiencies in its FTCA policies and practices.

99.     Even though the agency's imposition of a bar on reapplying for FTCA coverage on TCA is discussed below, it bears mention here that the agency's bar constitutes a legislative rule requiring notice and comment under the APA. 5 U.S.C. § 553. The language of the bar measure, which expressly refers to the negative coverage determination as "final and binding" and allows for reapplication only "on or after January 1, 2013," indicates that the bar on reapplication has, without exception, a binding effect for a fixed period of time. Such a legislative measure, as opposed to a mere statement of policy, cannot take effect without first going through notice and comment rulemaking. *Gen. Elec. Co. v. EPA*, 290 F.3d at 383; *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) ("policy statements are binding on neither the public nor the agency") (internal citation omitted).

THE AGENCY IS TAKING INCONSISTENT POSITIONS IN SIMILAR
CIRCUMSTANCES AND DEPARTING FROM LONGSTANDING
CUSTOM AND PRACTICE WITHOUT ANY REASONED
EXPLANATION FOR DOING SO

100.    By refusing to extend TCA's deemed status in CY 2013, the agency has acted arbitrarily and capriciously by: (a) treating TCA differently than it has treated at least one other health center in a similar situation, without any (much less a reasoned) explanation for doing so; and (b) departing from a longstanding custom and practice of working with centers "whenever possible" to "remedy areas of non-compliance." PAL 2012-02, § 2. It is well settled that agency action is arbitrary and capricious if it treats similar situations differently or departs from a longstanding custom and practice without a reasoned explanation for doing so. *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996) ("[a]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so") (citing *Nat'l Ass'n of Broadcasters v. FCC*, 740 F.2d 1190, 1201 (D.C. Cir. 1984)); *Motor Vehicle Mfrs. Ass'n v. State Farm Auto. Ins. Co.*, 463 U.S. at 43.

101.    On information and belief, in a similar situation, involving Soundview Health Center ("Soundview"), the agency failed to take action on the center's FTCA application (for CY 2011 coverage) until several months after its submission. When the agency finally took action, late in the 2010 calendar year, it expressed concerns with the center's implementation of risk management policies, as required by subsection (h)(1) of 42 U.S.C. § 233. To afford the center an opportunity to cure the alleged deficiencies, the agency extended the center's then-current (CY 2010) deeming period into the following year (CY 2011). Moreover, the agency offered to – and, indeed, did – work with the center during the extension period to resolve the agency's concerns and preserve the center's FTCA coverage (consistent with the agency's longstanding custom and practice). That cooperative effort resulted in the agency's approval of the center's application for FTCA coverage

for the remainder of CY 2011, thereby preventing a gap in the center's FTCA coverage and avoiding the cost of private insurance. The same thing happened with respect to Soundview's application for FTCA coverage for CY 2012. At the end of CY 2011, the agency noted deficiencies in the center's application and implementation of FTCA program requirements. But, once again, the agency extended the center's CY 2011 coverage into CY 2012, and worked with the center during the extension period to preserve Soundview's FTCA coverage.

102.    Here, the agency's untimely action on TCA's deeming application created the same predicament that Soundview had faced – *i.e.*, an insufficient opportunity to cure the alleged deficiencies, absent an extension of its deeming period. Citing the Soundview precedent, TCA requested an extension of its deeming period to resolve any compliance concerns and prevent an unnecessary and costly gap in its FTCA coverage. Despite the Soundview precedent, and longstanding policy of working with centers to resolve any compliance concerns (and thereby acting consistently with the FSHCAA's intent), the agency did not assist TCA in filing an approvable application and denied TCA's extension request without any explanation or attempt to distinguish the Soundview situation.

103.    The agency's disparate treatment of these similar situations violates another bedrock principle of administrative law. Agency action is arbitrary when it "silently depart[s] from previous policies and ignore[s] precedent," *Committee for Community Access v. FCC*, 737 F.2d 74, 77 (D.C. Cir. 1984), or offers insufficient reasons for treating similar situations differently. *El Rio Santa Cruz*, 300 F.Supp.2d at 42 (HHS's treatment of "similarly situated parties differently," and "failure to examine the relevant facts before it," for purposes of FTCA deeming under FSHCAA, is arbitrary and capricious in violation of APA), *aff'd*, *El Rio Santa Cruz*, 396 F.3d at 1272 (affirming on basis that HHS failed to examine relevant information); *see also Etelson v. Office of Pers. Mgmt.*, 684 F.2d 918, 926 (D.C. Cir. 1982) (government is at its "most arbitrary"

when it treats similarly situated individuals differently). Because the agency failed to treat TCA in the same (and much more favorable) manner as it treated another similarly situated center and departed from a longstanding custom and practice, without explanation, its refusal to extend TCA's deemed status into CY 2013 is arbitrary and capricious.

## HARM TO TCA

104.    As the direct result of the unlawful agency actions discussed above, TCA was forced to go to the private market to purchase malpractice insurance. The total private insurance premium for 2013 is $138,011. Of that amount, there is a 25 percent earned premium, which means that TCA is obligated to pay about $34,000 on day one as a minimum amount owed, and it will not be able to recover that amount even if it were to cancel the policy on day two or any other day within the first quarter of the year.

105.    In addition, TCA separately will have to purchase tail coverage because the insurance TCA has just purchased will not apply to claims made after the insurance has expired. Short of a remedy fashioned by the Court in this case, it is TCA's intention to re-apply for FTCA coverage and drop its private insurance if and when that coverage is granted. If the Court voids the agency decision (denying coverage) and reinstates FTCA coverage (with an effective date of no later than January 1, 2013), the tail insurance will not be needed. But at some point relatively soon, TCA will be in a position where – unless the Court has granted such relief – it will have to purchase such insurance. Tail insurance is quoted to be in excess of $126,000, if purchased before April 1, 2013, and more if purchase is delayed beyond that date. As such, the cost of private insurance for a single day in CY 2013 (earned premium plus tail coverage) will be about $160,000. That TCA is now obligated to pay the premiums for private malpractice insurance is concrete and immediate harm.

106.     Additionally, the funds TCA has obligated to pay for the insurance are no longer available to provide patient care, or to support its operations in the event of a revenue shortfall or non-payment by Medicaid. Nor can it use those funds to expand its operations or open new sites. That result is directly contrary to the objectives of the FSCHAA.

107.     Not only is TCA harmed by decrease in funds to provide health care services to the residents of its service area, but those residents also suffer the irreparable harm of loss access to health care services. In other words, the population served by TCA already faces a shortage of access to health care services, and any reduction or cessation in the operation of TCA is certain to have a negative impact on TCA's patients.

108.     TCA is further concerned about recruitment and retention of providers. One of the main recruiting advantages for TCA is that it has FTCA coverage so that providers do not have to purchase individual medical malpractice insurance coverage for the services they perform at or on behalf of the health center, and are essentially immune from malpractice suits. That TCA can no longer offer FTCA coverage to its providers may cause some providers to seek other employment. Other prospective providers may no longer consider TCA for employment because there is no FTCA coverage and therefore the greater individual liability. Even more damaging, providers may perceive the inability of TCA to obtain FTCA coverage as an indicator of the wellbeing of the center.

109.     TCA's Section 330 grant application and award for CY 2013 were premised on being deemed (as it has been since 1996) a PHS employee for FTCA purposes. The center's budget for CY 2013 therefore did not include the cost of private insurance.

CLAIM FOR RELIEF

Violations of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.

110.   Pursuant to the jurisdictional and cause of action statements set forth above, as well as in paragraphs below, this claim is described in those paragraphs.

111.   A case of actual controversy within the jurisdiction of this Court exists as to whether the agency's denial of TCA's deeming application is arbitrary, capricious, or contrary to law for the following independent reasons:

a.   The agency decision to deny TCA's deeming application is arbitrary and contrary to law because it rests on (what we label here as) *de facto* regulations that were issued without (a) authority or (b) notice and comment rulemaking. 5 U.S.C. § 553(b)(3).

b.   The agency violated the FSHCAA's clear and unequivocal command to make a FTCA coverage determination "within 30 days" of receipt of a deeming application. 42 U.S.C. § 233(g)(1)(E).

c.   The agency decision fails to examine the evidence before it and articulate a satisfactory explanation for its conclusion, *i.e.*, one that reflects a rational connection between the facts found and the choice made.

d.   As part of its untimely denial of TCA's deeming application, the agency added insult to injury by barring TCA from reapplying for FTCA coverage until on or after January 1, 2013. As its sole rationale for doing so, the agency asserts, contrary to the language of the FSHCAA and *El Rio Santa Cruz*, 396 F.2d at 1271, that a denial of FTCA coverage is "final and binding" as a matter of law. The Act expressly allows centers that have declined and dropped FTCA coverage,

are currently without it, to submit (with no timing limitation) an application for coverage. 42 U.S.C. § 233(g)(1)(H)(iv).

e.  By refusing to extend TCA's deemed status in CY 2013, the agency has acted arbitrarily and capriciously by: (a) treating TCA differently than it has treated at least one other health center in a similar situation, without a reasoned (much less any) explanation for doing so; and (b) departing from a longstanding custom and practice of working with centers whenever possible to remedy whatever problems there may be in their applications, rather than denying coverage and forcing a center to spend money in an overpriced insurance market.

## PRAYER FOR RELIEF

WHEREFORE, TCA asks that this Court enter an order:

112.   Declaring that the agency's Notice of Deeming Action, which denies plaintiff's application for deemed status for purposes of Federal Tort Claims Act coverage available to health centers pursuant to 42 U.S.C. § 233(g) *et seq.*, is void, unlawful, and in violation of the Administrative Procedure Act;

113.   Directing defendants to, within no more than 5 days from the date of the Court's Order, restore plaintiff's status as a health center deemed to be an employee of the Public Health Service for purposes of 42 U.S.C. § 233(g) *et seq.*, retroactive to May 5, 2012, and until plaintiff is afforded an application process that is in accordance with 42 U.S.C. § 233(g) *et seq.*;

114.   Directing defendants to restore plaintiff to the *status quo ante* the Notice of Deeming Action and afford plaintiff the "complete relief," *Bowen v. Massachusetts*, 487 U.S. 879,  911 (1988) (citing 5 U.S.C. § 702, 706), necessary to fulfill the legislative intent behind 42 U.S.C. § 233(g) *et seq.*

115.    Granting plaintiff its reasonable attorneys' fees and costs under this action;

116.    Retaining jurisdiction over this action to ensure that defendants fulfill all of the requirements of this Court's Orders; and

117.    Providing such other and further relief as the Court deems warranted or just.

Respectfully submitted,


/s/ Matthew S. Freedus
James L. Feldesman (23796)
Matthew S. Freedus (475887)
Marisa B. Guevara (979220)
Feldesman Tucker Leifer Fidell LLP
1129 20th Street, N.W., Fourth Floor
Washington, D.C. 20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)

*Attorneys for Plaintiff*


*Of Counsel*:

William Miceli, Esq.
Miner, Barnhill & Galland, P.C.
14 W. Erie St.
Chicago, IL 60654
(312) 751-1170 (telephone)
(312) 751-9490 (facsimile)